UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

1. $50,821.04 seized from Associated Bank account No. 2283264485, in the name of Midwest Publishers Home Office Inc.;

2. $30,722.30 seized from Associated Bank account No. 2283264493, in the name of Midwest Publishers Home Office Inc. DBA Bee Marketing;

3. $48,000 from Associated Bank cashier's check 20067406763;

4. $50,000 from Associated Bank cashier's check 2006740687;

5. $100,000 from Associated Bank cashier's check 2006740700;

6. $100,000 from Associated Bank cashier's check 2006740694;

7. All computer equipment seized from Midwest Publishers at 6730 Walker Street, Saint Louis Park, Minnesota; and

8. 5416 51st Avenue North, Crystal, Minnesota

        Defendants.

Case No. 24-cv-_____

# VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

The plaintiff, United States of America, through its attorneys Andrew M. Luger, United States Attorney for the District of Minnesota, and Craig Baune, Assistant United States Attorney, in a civil cause of action for forfeiture, alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

## NATURE OF THE ACTION

1. This is an action to forfeit and condemn the defendants *in rem* to the use and benefit of the United States of America pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C) for violations of 18 U.S.C. §§ 1341, 1343, 1349 and 1957.

## THE DEFENDANTS *IN REM*

2. The defendants *in rem* are the following properties:

   a. $30,722.30 seized from Associated Bank, account No. 2283264493, in the name of Midwest Publishers Home Office Inc. DBA Bee Marketing on or about February 19, 2020;

   b. $50,821.04 seized from Associated Bank, account No. 2283264485, in the name of Midwest Publishers Home Office Inc. on or about February 19, 2020;

   c. $48,000 from Associated Bank cashier's check 20067406763, representing the proceeds of Associated Bank cashier's check 2006476977, dated December 28, 2018, and originally made payable to Monica S. Hanssen;

   d. $50,000 from Associated Bank cashier's check 2006740687, representing the proceeds of Associated Bank cashier's check 2006478496, dated December 31, 2018, and originally made payable to Monica S. Hanssen;

   e. $100,000 from Associated Bank cashier's check 2006740700, representing the proceeds of Associated Bank cashier's check 2006677886, dated February 20, 2020, and originally made payable to Monica S. Hanssen;

2

  f. $100,000 from Associated Bank cashier's check 2006740694, representing the proceeds of Associated Bank cashier's check 2006677922, dated February 20, 2020, and originally made payable to Monica S. Hanssen;

  g. Miscellaneous computer equipment seized from Midwest Publishers at 6730 Walker Street, Saint Louis Park, Minnesota on February 19, 2020; and

  h. The real property including all structures located at 5416 51st Avenue North, Crystal, Minnesota, legally described as "SCHAEFER'S LAKE SIDE GROVE", Lot 006, E 75 FT OF W 238 FT OF S 173 6/10 FT EX ROAD, with property tax ID number 09-118-21-13-0061;

(Collectively, "the Defendant Properties.")

3. Defendants a-g above have been seized pursuant to seizure warrants or search and seizure warrants issued in the District of Minnesota and are in the custody of the United States Marshals Service.

4. The real property including all structures located at 5416 51st Avenue North, Crystal, Minnesota ("Defendant Real Property") has not been seized but is within the jurisdiction of this Court. The United States does not request authority from the Court to seize the Defendant Real Property at this time. The United States will, as provided by 18 U.S.C. §§ 985(b)(1) and (c)(1):

  a. Post notice of this action and a copy of the Complaint on the Defendant Real Property;

  b. Serve notice of this action on the owners of the Defendant Real Property and any other person or entity who may claim an interest in the Defendant Real Property, along with a copy of this Complaint; and

  c. File a notice of *lis pendens* in the county property records.

3

## JURISDICTION AND VENUE

5. Plaintiff brings this action *in rem* in its own right to forfeit and condemn the Defendant Properties. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345 and over an action for forfeiture under 28 U.S.C. § 1355(a).

6. This Court has *in rem* jurisdiction over the Defendant Properties under 28 U.S.C. § 1355(b). Upon the filing of this Complaint, the Plaintiff requests that the Clerk of Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b)(i), which the Plaintiff will execute upon Defendants a-g pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

7. Venue is proper in the District of Minnesota pursuant to 28 U.S.C. § 1355(b)(1) because acts or omissions giving rise to the forfeiture occurred in this District, and pursuant to 28 U.S.C. § 1395 because the Defendant Properties are located in this District.

## FACTS

**I.    OVERVIEW**

8. For more than a decade, until she was federally indicted in October 2020, Monica Sharma Hanssen, along with others, conspired to, devised and carried out a telemarketing scheme to defraud victim-consumers located across the United States, many of whom were elderly and vulnerable. She and others accomplished the fraud scheme by calling, or hiring people to call, victim-consumers who had one or more existing magazine subscriptions and offering to "renew" the existing magazine subscriptions, often at a reduced cost. In reality, Hanssen, her employees and co-conspirators were, through a series

of misrepresentations, tricking their victims into signing up for new magazine subscriptions that they did not want and often could not afford.

9. Hanssen and others bought and sold lists of victim-consumers who had current magazine subscriptions for use in their fraud scheme. As a result, many victim-consumers were victimized multiple times by multiple companies.

10. The fraud scheme affected thousands of consumers and generated millions of dollars of fraud proceeds to the participants, especially to Monica Hanssen and other owners of the corporations that were used to further the fraud.

11. Hanssen was charged criminally for these crimes in this District in the criminal case *United States v. Russell Rahm, et al,* Crim. No. 20-232 (JRT/DTS). As her trial approached, however, she fled the country to avoid prosecution. *See, e.g., Rahm,* 20-cr-232 (JRT/DTS) ECF Nos. 1881, 1971.

12. She has not returned as of the filing of this Complaint and, upon information and belief, remains in Sweden.

13. This civil forfeiture case is being filed to enable the government to complete the forfeiture of the Defendant Properties because their criminal forfeiture cannot be completed while Hanssen remains abroad.

## II. THE FRAUD SCHEME AND HANSSEN'S INVOLVEMENT

### Overview and Purpose of the Conspiracy

14. The purpose of the conspiracy was to carry out a telemarketing fraud scheme involving magazine subscription sales. The conspiracy involved a nationwide network of telemarketing companies involved in fraudulent magazine sales. These companies used

sales scripts to defraud victim-consumers, many of whom were elderly or otherwise vulnerable, across the United States. The fraudulent sales scripts were designed to induce consumers, through a series of lies and misrepresentations, into unwittingly signing up for expensive magazine subscriptions.

15. This extensive conspiracy included many participants in different roles. To summarize, the top level of the conspiracy included the leaders who not only owned companies that sold the fraudulent magazine subscriptions, but who also provided the necessary software to track orders and customer information, who provided the lists of customer leads that could be loaded onto automated voice dialers, and who performed collections against the victim-consumers, among other things.

16. The next level of the conspiracy, which included Hanssen, was Company Owners. These participants owned companies involved in fraudulent magazine sales. The Company Owners operated telemarketing call centers at which telemarketers used fraudulent sales scripts to trick victim-consumers into unwittingly signing up for expensive magazine subscriptions.

17. Hanssen owned and operated Midwest Publishers Home Office ("MPHO"), a Minnesota-based company involved in fraudulent magazine sales. MPHO had a telemarketing call center in St. Louis Park, Minnesota.

18. Call Center Managers managed call centers involved in fraudulent magazine sales. The Call Center Managers trained telemarketers to use the fraudulent sales scripts to defraud victim-consumers and supervised the call centers on a day-to-day basis.

19. Telemarketers called victim-consumers around the United States using fraudulent sales scripts and, through a series of knowing and deliberate lies and misstatements, tricked the victim-consumers into unwittingly signing up for expensive new magazine subscriptions.

20. Lead Brokers provided lead lists of consumers who had active and ongoing magazine subscriptions through other companies. The Lead Brokers provided these lead lists to the Company Owners knowing that they would use them to carry out the fraud scheme.

### **Manner and Means of the Conspiracy**

21. As part of the scheme, Company Owners purchased lead lists from the Lead Brokers. The lead lists contained consumers who had active and ongoing magazine subscriptions through other companies. These lists were referred to as "paid-during-service" or "PDS" leads. Some of the PDS lead lists identified the magazines to which the individuals were currently subscribed and the credit card number or other payment information used to pay for the subscription. Telemarketers used the information on the PDS lead lists to fraudulently pose as the victim-consumers' existing magazine provider, calling about an existing subscription, rather than attempting to sign consumers up for an entirely new magazine subscription.

22. The Lead Brokers specifically marketed PDS lead lists to companies involved in the fraudulent magazine sales scheme. The Lead Brokers knew that many of the consumers on this list were elderly and susceptible to fraudulent and deceptive sales tactics. They also knew that PDS lists were particularly valuable to companies engaged in

fraudulent magazine sales because the companies posed as the victim-consumers' existing magazine company to trick them into signing up for new subscriptions. Accordingly, PDS lead lists commanded a significant premium and sold for as much as $10 or $15 per name.

23. The Company Owners, including Hanssen, provided PDS lead lists to the Call Center Managers and Telemarketers. At the direction of the Company Owners and Call Center Managers, the Telemarketers called the names on the PDS lead lists using fraudulent sales scripts.

24. The scripts directed the Telemarketers to claim—falsely—that they were calling from the victim-consumers' existing magazine subscription company and about an existing magazine subscription. The Telemarketers claimed—again falsely—to be calling with an offer to renew the victim-consumer's existing magazine subscription, often at a reduced cost.

25. In reality, the companies had no existing relationship with most of the victim-consumers and the Telemarketers were not calling about an existing magazine subscription. Instead they were calling to defraud them by tricking them into unwittingly signing up for entirely new magazine subscriptions. Some companies would also call lists of their own victim-consumers and, using a similarly fraudulent script, trick them into signing up for additional magazine subscriptions.

26. The Company Owners, Call Center Managers, Telemarketers, and Lead Brokers all knew that many of the consumers on these lists were elderly and susceptible to fraudulent and deceptive sales tactics. Nevertheless, participants in the conspiracy called

people on these lists and tricked them into signing up for expensive magazine subscription packages.

27. The Company Owners also bought and sold lists of their own victim-consumers to one another. As with the PDS lead lists purchased from the Lead Brokers, the Company Owners directed the Telemarketers to use this information to fraudulently pose as the victim-consumers' existing magazine company and falsely claim to be calling with an offer to renew or reduce the price of an existing magazine subscription. As a result, many victim-consumers were victimized again and again by multiple magazine companies. Some victim-consumers were fraudulently billed by ten or more magazine companies at a time and received more than $1,000 in magazine subscription charges in a month.

28. MPHO was one of the companies that participated in this fraud scheme in the manner described above.

29. Hanssen and other Company Owners took steps to cover up their fraud. The Company Owners and Call Center Managers directed the Telemarketers to record only a final portion of the call, during which the Telemarketers "verified" that the victim-consumers were purchasing a new magazine subscription package. The Company Owners and Call Center Managers instructed the Telemarketers not to record the earlier portion of the call, during which they falsely represented that they were calling to lower the payments on an existing magazine subscription. The Company Owners later used these deceptive recordings when victim-consumers attempted to challenge the charges and reported the fraud to the Better Business Bureau ("BBB"), state Attorney General offices, and other regulatory agencies.

30. During the course of their scheme, the co-conspirators defrauded more than 150,000 victims across the United States. In all, they received more than $300 million from the victims of the scheme.

### Hanssen's Role in the Conspiracy

31. As is stated above, Hanssen was an owner of MHPO, a Minnesota-based company involved in fraudulent magazine sales.

32. MPHO was incorporated in 2003. It also did business under the name Midwest Publishers, Inc.

33. Minnesota Secretary of State records list "M. Hanssen" as CEO of MPHO. During his January 2019 proffer interview, an individual identified Monica Hanssen as being involved in fraudulent magazine sales.

34. Hanssen's husband, Timothy Hanssen, admitted in his Plea Agreement and Sentencing Stipulations that he participated in the fraud scheme described above through his participation in MPHO, which was owned by Monica Hanssen. *United States v. Rahm, et al,* Crim. No. 20-232 (JRT/DTS) ECF No. 1685 ¶ 2.

35. Timothy Hanssen admitted that MPHO used fraudulent sales scripts to defraud victim-consumers, many of whom were elderly or otherwise vulnerable, out of hundreds or even thousands of dollars. The fraudulent sales scripts were designed to induce consumers, through a series of lies and misrepresentations, into making large or repeat payments to the companies. *Id.*

36. Timothy Hanssen further admitted that, at his direction, MPHO employees called victim-consumers on the lead lists MPHO had purchased to deceitfully sign them up

for expensive magazine subscriptions. The lies and misrepresentations included false claims that the MPHO employees were calling from the victim-consumer's existing magazine subscription company and about a current subscription, falsely claiming they would renew it at a reduced cost. In reality, MPHO often had no existing relationship with the victim-consumers and its employees were calling to defraud them by tricking them into unwittingly signing up for entirely new magazine subscriptions. *Id.*

37. Timothy Hanssen admitted that MPHO collected more than $9,500,000 from victims as a result of the fraud scheme between 2001 and 2020. *Id.*

38. Moreover, the investigation in this matter has shown that, because MPHO was created and operated for the purpose of engaging in the magazine subscription fraud conspiracy, it would not have existed and would not have generated any income but for that conspiracy.

39. All or virtually all of the income MPHO generated was obtained, directly or indirectly, as a result of the fraud scheme and conspiracy.

**Hanssen's Indictment and Flight From Justice**

40. Hanssen was indicted on October 20, 2020 in Case No. 20-232. ECF No. 12. She was arraigned on November 18, 2020 and had counsel appointed to represent her in the criminal case.

41. After extensive pretrial litigation, the criminal trial was scheduled to commence on October 9, 2023. ECF No. 1698.

42. Hanssen failed to appear for pretrial motions hearing on September 29, 2023, and a bench warrant was issued. *See* ECF No. 1887.

11

43. The investigation has shown that Hanssen, who is also a citizen of Sweden, fled from the United States for the purpose of avoiding the criminal trial in Case No. 20-232, and that she remains abroad and outside of the jurisdiction of this court in order to evade justice.

### III.  SUMMARY OF TRACING

44. The Defendant Properties are all traceable, directly or indirectly, to the fraud scheme and conspiracy described above as is set forth in greater detail below.

### The Bank Accounts

45. MPHO operated Associated Bank account Nos. 2283264485 and 2283264493. Between January 1, 2013 and February 29, 2020, the 4485 Account received deposits totaling $8,231,064.93. The 4493 Account received deposits totaling $938,944.90 during that same time period.

46. Tracing analysis demonstrated that all or nearly all of the funds deposited into these two accounts could be traced to the fraud scheme and conspiracy. The vast majority of deposits into this account were from credit card or merchant accounts, and significant sums were deposited from personal checks and money orders consistent with payment being made by victims of the fraud scheme. Other transfers were from people or entities known to have been involved in the fraud scheme and conspiracy. Few if any deposits could not reliably be traced to the fraud scheme.

### The Cashier's Checks

47. The four cashier's checks (Defendants 3-6) described above were purchased with funds traceable to the fraud scheme as set forth below.

48.     Defendant 3 is $48,000 from Associated Bank cashier's check 20067406763, representing the proceeds of Associated Bank cashier's check 2006476977, dated December 28, 2018, and originally made payable to Monica S. Hanssen. This cashier's check (ending in 977) was initially drawn from the 4485 Account described above on December 28, 2018. At that time, the 4485 account was funded entirely or virtually entirely with proceeds of the fraud scheme described above.

49.     Defendant 4 is $50,000 from Associated Bank cashier's check 2006740687, representing the proceeds of Associated Bank cashier's check 2006478496, dated December 31, 2018, and originally made payable to Monica S. Hanssen. This cashier's check (ending in 496) was initially drawn from the 4485 Account described above on December 28, 2018. At that time, the 4485 account was funded entirely or virtually entirely with proceeds of the fraud scheme described above.

50.     Defendant 5 is $100,000 from Associated Bank cashier's check 2006740700, representing the proceeds of Associated Bank cashier's check 2006677886, dated February 20, 2020, and originally made payable to Monica S. Hanssen. This check (ending in 886) was purchased using funds from Hanssen's personal account at Associated Bank ending in 0721.

51.     The majority of the funds deposited into the 0721 account before cashier's check ending in 886 was purchased have been traced to the fraud scheme. Although some of the funds deposited into the 0721 Account have not been traced clearly to the fraud scheme, Hanssen had only very limited income that was not traceable to the fraud scheme. Moreover, the funds used to purchase this cashier's check are traceable to proceeds from

13

the sale of real property Hanssen owned in Minnetrista, Minnesota. Hanssen's Minnetrista property had, in turn, been financed and refinanced with two mortgages for which the monthly payments were made directly from the 4485 Account. As a result, the clear majority of the funds that were used to purchase the cashier's check ending in 886 were traceable to proceeds of the fraud scheme.

52. Defendant 6 is $100,000 from Associated Bank cashier's check 2006740694, representing the proceeds of Associated Bank cashier's check 2006677922, dated February 20, 2020, and originally made payable to Monica S. Hanssen.

53. The cashier's check ending in 7922 was purchased with funds from an Associated Bank account ending in 6227, which was controlled by Monica Hanssen. Bank records show that approximately 75 percent of the funds deposited into this account between August 2015 and February 20, 2020 were transfers from the 721, 4485 and 4493 accounts, all of which were funded primarily with fraud proceeds. The remainder of the funds deposited into the 6227 account were from rental payments.

54. As a result, the majority of the funds used to purchase the cashier's check ending in 7922 were traceable to the fraud scheme.

55. With respect to each of the cashier's checks described above, the purchase of the check was a monetary transaction that involved more than $10,000 of criminally derived property that was derived from specified unlawful activity (Wire Fraud and Mail Fraud) in violation of 18 U.S.C. § 1957. As is set forth below, all funds involved in those transactions and all funds traceable thereto are subject to forfeiture.

56. On or about March 5, 2020, the United States took custody of four cashier's checks from Monica Sharma-Hanssen. Because those checks were made out to Hanssen, rather than the United States, it was initially unable to negotiate those checks despite having physical custody of them.

57. The United States subsequently obtained seizure warrants for the funds associated with the cashier's checks. As a result, each of the cashier's checks was reissued by the issuing bank to the United States Marshals Service, which deposited the funds into its seized asset fund, where they remain.

58. Through this Complaint, therefore, the United States seeks the funds associated with the re-issued cashier's checks, which remain traceable to the fraud scheme as set forth above.

## The Computer Equipment Seized From MPHO

59. Upon information and belief, the computer and other electronic equipment that was seized from MPHO is traceable to proceeds of the fraud scheme and conspiracy. Equipment purchases were reflected in the bank records of the accounts described above, and it would be consistent with typical business practices for a business entity such as MPHO to use its own funds, rather than outside sources, to purchase computer equipment that is used in its offices. As a result, the computer equipment seized from MPHO constitutes or is traceable to the proceeds of the magazine subscription fraud scheme described above.

**The Real Property**

60.     The Real Property was initially purchased by Hanssen in 2003, based upon real estate records and other documents obtained during this investigation.

61.     Hanssen refinanced this property in June 2015 through a new mortgage issued in the amount of $142,000 by lender Five Star Mortgage.

62.     Since that mortgage was taken out, all payments were made from the 4485 Account held by MPHO. As is set forth above, the 4485 Account was overwhelmingly funded with fraud proceeds.

63.     As a result, all or virtually all of the equity in the Real Property is traceable to proceeds of the magazine subscription fraud scheme. Moreover, but for the payments made on the current mortgage, which were made with fraud proceeds, the mortgage would not have been paid on this property and Hanssen would, therefore, have no remaining ownership interest in the Real Property.

**BASIS FOR FORFEITURE**

**COUNT 1**
**DEFENDANTS 1-4, 7, 8**
**18 U.S.C. § 981(A)(1)(C) for Violations of 18 U.S.C. §§ 1341, 1343 and 1349**

64.     The actions described above constitute wire fraud, mail fraud and conspiracy to commit mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, and 1349.

65.     Civil forfeiture of the proceeds of violations of wire fraud and mail fraud, and conspiracy to commit mail and wire fraud, is authorized by 18 U.S.C. § 981(a)(1)(C). More specifically, § 981(a)(1)(C) authorizes forfeiture of "any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting

'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." Section 1956(c)(7)(A) defines the term "specified unlawful activity" as including "any act or activity constituting an offense listed in section 1961(1) of this title." And 18 U.S.C. § 1961(1) includes violations of 18 U.S.C. §§ 1341 and 1343 in its definition of racketeering activity.

66. The Defendant Properties set forth above, namely Defendants 1-4, 7 and 8, each constitute, and are derived from, proceeds of wire and mail fraud, and a conspiracy and are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## COUNT 2
### Defendants 3-6
### 18 U.S.C. § 981(A)(1)(A) – for Violations of 18 U.S.C. § 1957

67. Pursuant to 18 U.S.C. § 981(a)(1)(A), the United States is authorized to forfeit "any property, real or personal, involved in a transaction . . . in violation of section 1956 [or] 1957… of this title, or any property traceable to such property."

68. 18 U.S.C. § 1957(a) prohibits among other things, knowingly engaging in a monetary transaction in criminally derived property of a value of more than $10,000, when such property derived from a specified unlawful activity.

69. Mail fraud and wire fraud are specified unlawful activities pursuant to 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1).

70. Hanssen's purchase of each of the cashier's checks described above was a monetary transaction that included more than $10,000 of criminally derived property that was derived from mail fraud and wire fraud schemes.

71. The United States is authorized to forfeit all property involved in each of those transactions and any property traceable thereto.

72. As a result, all funds involved in each of the four cashier's checks that Hanssen purchased were subject to forfeiture because they were involved in a violation of § 1957.

73. The funds seized from the reissued cashier's checks, therefore, are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they are traceable to funds that were involved in violations of 18 U.S.C. § 1957.

## CLAIM FOR RELIEF

74. The United States requests notice of this action be given to all persons who reasonably appear to be potential claimants with an interest in the Defendants *in rem*; that the Defendants *in rem* be forfeited and condemned to the United States of America; and that the Plaintiff be awarded its costs and disbursements in this action and for such other relief as the Court deems just and proper.

Dated: 6/27/2024

ANDREW M. LUGER
United States Attorney

*s/Craig Baune*
BY: CRAIG R. BAUNE
Attorney ID No. 331727
Assistant United States Attorneys
600 United States Courthouse
300 South Fourth Street
Minneapolis, MN 55415
Phone: 612-664-5600
Craig.Baune@usdoj.gov

## VERIFICATION

I, Jared Kary, verify and declare under penalty of perjury as follows:

I am and have been a Special Agent with the Federal Bureau of Investigation since 2008. I have read the foregoing Verified Complaint *In Rem* and know the contents thereof, and the matters contained in the Verified Complaint are true to my own knowledge, except that those matters not within my knowledge are alleged on information and belief, and I believe those matters to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information provided to me by other law enforcement agencies and officers, and information I have learned by reviewing reports prepared by other law enforcement agencies and officers, as well as my investigation of this case, as an FBI Special Agent.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated: 6/18/2024

*s/Jared F. Kary*
JARED KARY, Special Agent
Federal Bureau of Investigation